# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a public benefit non-profit corporation,<br><br>    Plaintiff,<br><br>  vs.<br><br>HUGHES BROTHERS AIRCRAFTERS, INC., a California corporation,<br><br>    Defendant. | Case No. 2:22-cv-04458-DSF-JPR<br><br>**ORDER** |

Good cause appearing, and the Parties having stipulated and agreed, IT IS HEREBY ORDERED as follows:

Plaintiff LOS ANGELES WATERKEEPER's claims against Defendant HUGHES BROTHERS AIRCRAFTERS, INC., as set forth in the Complaint and Notice of Violations and Intent to File Suit filed in this action, are hereby dismissed in their entirety with prejudice, and the Court shall retain jurisdiction over the Parties for purposes of dispute resolution and enforcement of the Settlement Agreement, attached hereto as Exhibit A and fully incorporated by reference herein. Each of the Parties shall

bear its own attorneys' and expert fees and costs, except as provided for in the Settlement Agreement.

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED:  November 18, 2022

Honorable Dale S. Fischer
UNITED STATES DISTRICT JUDGE

**Exhibit A**

Daniel Cooper (SBN 153576)
daniel@sycamore.law
Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, CA 94129
Tel: (415) 360-2962

Benjamin Harris (SBN 313193)
ben@lawaterkeeper.org
Barak Kamelgard (SBN 298822)
barak@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street Suite 250
Los Angeles, CA 90012
Tel: (310) 394-6162
Fax: (310) 394-6178

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

Melissa A. Thorme (SBN 151278)
mthorme@downeybrand.com
DOWNEY BRAND LLP
621 Capitol Mall, 18th Floor,
Sacramento, CA 95814-4731
Tel:    (916) 520-5376
Fax:    (916) 520-5776

Attorneys for Defendant
HUGHES BROTHERS
AIRCRAFTERS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a public benefit non-profit corporation,<br><br>              Plaintiff,<br><br>        vs.<br><br>HUGHES BROTHERS AIRCRAFTERS, INC., a California corporation,<br><br>              Defendant. | Case No. 2:22-cv-04458-DSF-JPR<br><br>**STIPULATED SETTLEMENT AGREEMENT**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.*) |

**WHEREAS**, Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its main office in Santa Monica, California;

**WHEREAS**, LA Waterkeeper is dedicated to the preservation, protection, and defense of the surface, ground, coastal, and ocean waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS**, Hughes Brothers Aircrafters, Inc. ("Hughes" or "Defendant") owns and operates a Standard Industrial Classification ("SIC") Code 3728 (Aircraft Parts and Auxiliary Equipment) industrial facility serving the aerospace industry at 11010 Garfield Place in South Gate, ("Facility") with a total area of 1.61 acres and an industrial area of approximately 1.25 acres;

**WHEREAS**, storm water discharges associated with industrial activity at the Facility are regulated by the National Pollutant Discharge Elimination System General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 2014-57-DWQ as amended on November 6, 2018 ("General Permit"), and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342;

**WHEREAS**, the General Permit establishes numeric action levels ("NALs"), and enforceable numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have certain approved Total Maximum Daily Loads ("TMDLs") with waste load allocations for industrial storm water;

**WHEREAS**, the exceedance (as defined at General Permit, § V.C.1) of any NEL after July 1, 2020, constitutes a violation of the General Permit and may result in the imposition of Mandatory Minimum Penalties ("MMPs") pursuant to California Water Code §§ 13385(h) and (i);

**WHEREAS,** the Regional Water Quality Control Board for the Los Angeles Region ("Regional Board") issued Hughes a Time Schedule Order in 2021 ("2021

---

STIPULATED SETTLEMENT AGREEMENT      2      Case No. 2:22-cv-04458-DSF-JPR

TSO"), Order No. R4-2021-0001, recognizing Hughes "will require additional pollutant control measures to comply with the applicable NELs," including the installation of four (4) storm resistant storage containers;

**WHEREAS**, the 2021 TSO provided Hughes a time schedule to complete these additional control measures until December 31, 2024, and set interim limits for total zinc of 1.72 mg/L and for total lead of 0.316 mg/L that, if not exceeded, would exempt Hughes from the imposition of state-issued MMPs during the term of the 2021 TSO;

**WHEREAS,** Hughes completed installation of the four (4) storm resistant containers required by the 2021 TSO, but has not yet collected adequate storm water data to determine if these controls will affect storm water quality;

**WHEREAS**, Hughes ordered and installed an additional storm resistant container given that the four containers required by the 2021 TSO were not sufficient to isolate tools and equipment containing lead and zinc from contact with storm water;

**WHEREAS**, the Regional Board did not impose any MMPs in connection with the 2021 TSO, but rather waived administrative fines and penalties despite anticipated violations of the General Permit;

**WHEREAS**, Plaintiff and Defendant (collectively the "SETTLING PARTIES" or "Parties," and individually a "Party") agree that under currently applicable case law, the 2012 TSO does not constitute diligent prosecution or otherwise affect LA Waterkeeper's ability to pursue this enforcement action (*See Friends of Mariposa Creek v. Mariposa Pub. Utils. Dist.,* 2015 U.S. Dist. LEXIS 128783 (E.D. Cal); *Citizens for a Better Environment-California v. Union Oil Co. of Cal.*, 83 F.3d 1111 (9th Cir. 1996); *Knee Deep Cattle Co. v. Bindana Inv. Co. Ltd*., 94 F.3d 514 (9th Cir. 1996));

**WHEREAS**, the SETTLING PARTIES further agree that under currently applicable case law, the 2021 TSO is not relevant to establishing the Court's jurisdiction over the subject matter or Parties in this action;

**WHEREAS**, on April 12, 2022, LA Waterkeeper served a notice of intent to sue ("60-Day Notice Letter") on Hughes;

**WHEREAS**, on June 29, 2022, LA Waterkeeper filed a complaint against Hughes in the Central District of California, Civil Case No. 2:22-cv-4458 ("Complaint");

**WHEREAS**, Plaintiff's 60-Day Notice Letter and Complaint alleged violations of the General Permit and CWA for Defendant's discharges of pollutants into storm drains and downstream surface waters, including the Los Angeles River and the Pacific Ocean ("Receiving Waters");

**WHEREAS**, Hughes denies all allegations set forth in the 60-Day Notice Letter and Complaint;

**WHEREAS**, the SETTLING PARTIES, without either adjudication of Plaintiff's claims or any admission by Defendant of any alleged violation, believe it is in their mutual interest to enter into this Stipulated Settlement Agreement ("AGREEMENT") setting forth terms and conditions appropriate to resolving the allegations set forth in the 60-Day Notice Letter and Complaint without further proceedings; and

**WHEREAS**, all actions taken by the SETTLING PARTIES pursuant to this AGREEMENT shall be made in compliance with applicable federal, state, and local rules and regulations.

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the SETTLING PARTIES agree for purposes related to this AGREEMENT as follows:

1.     The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A).

2.     Venue is appropriate in the Central District Court pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations are taking place is located within this District.

3.     The Complaint states a claim upon which relief may be granted against Defendant pursuant to Section 505 of the CWA, 33 U.S.C. § 1365.

4.     LA Waterkeeper has standing to bring this action.

//

5.    The Court shall retain jurisdiction over this action and the SETTLING PARTIES for purposes of interpreting, modifying, and/or enforcing the terms of this AGREEMENT.

## I.    AGREEMENT OBJECTIVES

6.    It is the express purpose of the SETTLING PARTIES through this AGREEMENT to further the objectives of the Clean Water Act, and to resolve all issues alleged by LA Waterkeeper in its 60-Day Notice Letter and Complaint. These objectives include compliance with the provisions of this AGREEMENT, compliance with all terms and conditions of the General Permit, and compliance with all applicable sections of the Clean Water Act at the Facility.

7.    In light of these objectives and as set forth fully below, the SETTLING PARTIES agree to comply with the provisions of this AGREEMENT, and Hughes agrees to comply with the applicable terms and conditions of the General Permit and all applicable requirements of the Clean Water Act at the Facility.

## II.    AGENCY REVIEW AND AGREEMENT TERM

### A.   Agency Review of AGREEMENT

8.    <u>Agency Review</u>. Plaintiff shall submit this AGREEMENT to the United States Department of Justice and the United States Environmental Protection Agency (the "Federal Agencies"), within five (5) business days of the Effective Date (defined at paragraph 11) for agency review consistent with <u>40 C.F.R. § 135.5</u>. The agency review period expires upon approval or forty-five (45) calendar days after receipt by the Federal Agencies ("Agency Approval Date").  Receipt will be evidenced by certified return receipts, copies of which shall be provided to Defendant. In the event that the Federal Agencies object this AGREEMENT, the Parties shall meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies.

9.    <u>Court Notice</u>. Within three (3) business days of the Effective Date of this AGREEMENT, Plaintiff shall notify the Court of settlement and of the expiration date for review by the Federal Agencies, as required by <u>40 C.F.R. § 135.5</u>.

10.    Case Dismissal. Within ten (10) court days of the Agency Approval Date, LA Waterkeeper shall file a Stipulation to Dismiss with Prejudice and [Proposed] Order ("Stipulation and Order") pursuant to Federal Rule of Civil Procedure 41(a)(2) with the District Court with this AGREEMENT attached and incorporated by reference, specifying that LA Waterkeeper is dismissing with prejudice all claims in its Complaint. The Stipulation and Order shall state that the District Court will maintain jurisdiction over the SETTLING PARTIES for the sole purpose of resolving disputes regarding the SETTLING PARTIES' compliance with this AGREEMENT through the later of: (i) the Termination Date; (ii) the conclusion of any proceeding to enforce this AGREEMENT initiated prior to the Termination Date (defined at paragraph 12); or (iii) the completion of any payment or affirmative duty required by this AGREEMENT. The date the Court signs the Order shall be the "Dismissal Date."

### B.    Effective Date and Termination

11.    Effective Date. The Effective Date of this AGREEMENT shall be the date of execution as evidenced by the last signature of the SETTLING PARTIES.

12.    Termination Date. This AGREEMENT shall terminate the later of: (i) September 1, 2025; (ii) seven (7) calendar days from the conclusion of any proceeding or process to enforce this AGREEMENT initiated prior to September 1, 2025; or (iii) seven (7) calendar days from Hughes' completion of all payments required by this AGREEMENT ("Termination Date").

## III.    FACILITY DESCRIPTION

13.    Industrial activities conducted at the Facility include, but may not be limited to: the manufacture of sheet metal assemblies for commercial aircraft; casting of zinc dies and lead punches; shaping of sheet metal by hydroform press; cutting and shearing of sheet metal; cleaning and grinding formed aircraft parts; and heat treatment of aluminum parts.

14.    Hughes conducts the majority, but not all, industrial activities inside buildings at the Facility.

15.     Some industrial activities conducted indoors or under cover (e.g., metal melting, grinding, rinsing dies) have the potential to affect the quality of storm water discharged from the Facility.

16.     Storm water currently discharges from the Facility to an inlet connected to the Los Angeles County municipal separate storm sewer system on Garfield Place and is either: (a) collected and pumped to one (1) of three (3) designated discharge points; or (b) runs off as sheet flow (e.g., from the Shipping and Receiving area south-west of Building 8).

## IV.     COMMITMENTS OF THE PARTIES

### A.     Discharge Prohibitions

17.     Any unauthorized non-storm water discharge, as defined in the General Permit, off-site from the Facility shall be a violation of this AGREEMENT.

### B.     Storm Water Pollution Controls

18.     <u>Rain Gauge/Sensor</u>. Hughes shall install an electronic rain gauge or sensor at the Facility within ten (10) calendar days of the Effective Date. The rain gauge/sensor shall be capable of measuring precipitation down to at least 0.1 inches, and record start/stop times for all rain events. During the term of this AGREEMENT, Hughes shall collect data using the gauge/sensor for all precipitation events to the nearest 0.1 inch, including start/stop times. Data from the rain gauge/sensor shall be conclusive of precipitation quantities and timing for purposes of this AGREEMENT absent clear data errors.

19.     <u>Shipping and Receiving Driveway Modification</u>. Hughes has added a new driveway sample point adjacent to Garfield Place and to the south-west of Building 8, as a new sampling location ("Discharge Point 4"). Hughes shall include Discharge Point 4 in the SWPPP, and shall collect and analyze storm water samples from Discharge Point 4.

20.     <u>Trench Drain Installation</u>. If data analyses of storm water samples collected at Discharge Point 4 demonstrate two (2) or more exceedances any of the numeric standards for any pollutant in Table 1 ("Table 1 Standard") during the 2022-2023 or 2023-2024 Reporting Years (July 1 – June 30) (e.g., at Discharge Point 4, an

exceedance of the 0.06749 mg/L standard for copper on January 8, 2023 and an exceedance of the 0.159 mg/L standard for zinc on March 18, 2024, or an exceedances of the 0.094 mg/L standard for lead on December 11, 2022 and December 17, 2022), Hughes shall install a trench drain ("Trench Drain") across the driveway onto Garfield Place (see Exhibit A) at the southern end of the Facility before October 1 of the wet season following the Exceedance.

21.   Trench Drain Design. The Trench Drain shall be: (i) designed to collect and be capable of collecting all sheet flow from the Shipping and Receiving area; (ii) equipped with StormwaterBIOCHAR filtration (or equivalent) technology; and (iii) equipped with a sampling port(s) (or similar physical structure(s)) for collecting storm water samples.

22.   Connecting the Trench Drain to the Treatment System. If after installation of the Trench Drain per paragraphs 20 and 21, data analyses of storm water samples collected at Discharge Point 4 demonstrate one (1) or more Exceedances (as defined in paragraph 53) of any Table 1 Standard, then Hughes shall connect the Trench Drain to the Treatment System described below.

23.   Storm Water Treatment Plan.  On or before November 21, 2022, Hughes shall submit a plan ("Treatment Plan") to LA Waterkeeper for the design and installation of a storm water treatment system that includes pre-settling, polymer- or electronically-assisted coagulation, followed by filtration ("Treatment System"). Hughes may propose the use of an alternative treatment technology of equivalent effectiveness as demonstrated by independent, third-party data, i.e., not the manufacturer's own data, for pollutants listed in Table 1.

24.   Treatment System Design. The Treatment System shall be capable of treating storm water runoff generated at the Facility by an 85th percentile, 24-hour storm event (as defined in the General Permit Section X.H.6), including storm water currently pumped to the Facility's three (3) discharge points, and flows from the Trench Drain that may be installed at the Facility pursuant to paragraphs 20-22.  The Treatment

System shall be designed to reduce pollutant concentrations in storm water discharges to comply with the Table 1 Standards, and shall be equipped with a discharge port(s) (or similar physical structure(s)) for the collection of storm water samples.

25.    The Treatment Plan must: (a) identify the company designing the Treatment System, including a description of the company's experience in designing, installing, maintaining, and operating similar technology; and (b) contain a detailed description, and technical analysis, of the proposed Treatment System, including its individual components. If Hughes proposes to use a polymer-based system, the Treatment Plan must contain a proposal and schedule for performing bench tests with candidate polymers using samples of Hughes' actual storm water to guide selection of the best-performing polymer.

26.    <u>Treatment Plan Review</u>. Following receipt of the Treatment Plan, LA Waterkeeper shall have fifteen (15) calendar days to review, comment on, and make recommendations for the Treatment Plan and Treatment System. Hughes shall incorporate all comments and recommendations from LA Waterkeeper into its final plan or, alternatively, provide a detailed written justification explaining why any comment(s) or recommendation(s) will be not accepted and/or incorporated, and resubmit the Treatment Plan to LA Waterkeeper within fifteen (15) calendar days. In the event of any dispute regarding Hughes' incorporation of and/or responses to LA Waterkeeper's comments or recommendations, either Party may invoke the Dispute Resolution procedures set out in Section V of this AGREEMENT, which shall toll the requirements in paragraph 27 until resolved.

27.    <u>Treatment System Installation</u>. Within ten (10) weeks of its submittal of the final Treatment Plan to LA Waterkeeper, Hughes shall install the Treatment System. Hughes shall notify LA Waterkeeper that the Treatment System was installed within five (5) calendar days of installation.

28.    <u>Treatment System Optimization</u>. Hughes shall complete all activities to optimize the Treatment System, including but not limited to bench-scale testing to select the

appropriate treatment media, prior to October 1, 2023. Hughes shall notify LA Waterkeeper that the Treatment System is considered optimized and fully operational within five (5) calendar days of optimization and full functionality.

29.   <u>Treatment System Operation and Maintenance</u>. Hughes shall retain the company that designs and installs the Treatment System to train Facility staff on the proper operation and maintenance, or Hughes shall contract the company to perform operation and maintenance itself.

30.   <u>Mechanized Sweeping</u>. During the term of this AGREEMENT, at least two (2) times per week, Hughes shall complete (or cause to be completed) mechanized sweeping of all indoor and outdoor industrial floor areas using a regenerative air sweeper, including roofed/covered and un-roofed/covered areas and particularly the Shipping and Receiving area to the south of Building 8, accessible to the mechanized sweeper.

31.   <u>Manual Sweeping</u>. During the term of this AGREEMENT, at least two (2) times per week, Hughes shall conduct manual sweeping of all indoor and outdoor industrial floor areas not accessible to the mechanized sweeper, including roofed/covered and un-roofed/uncovered areas.

32.   <u>Elevated Surface Cleaning (With Storm Water Treatment System)</u>. Starting with the 2023-2024 Reporting Year, Hughes shall employ a power washer to clean the roofs of Buildings 3, 5, and 6 after September 1 and before October 15 during each year this AGREEMENT is in effect. As needed, Hughes shall also power wash other buildings, shed roofs (e.g., over the rinse tanks), and other above-ground surface areas capable of receiving aerial deposition of industrial dust and/or emissions (e.g., containers used to store dies and punches). Hughes shall capture and dispose of all rinse water generated during elevated surface cleanings in accordance with, as applicable, all local, state, and federal waste laws and regulations.

33.   <u>Storage of Dies, Punches, and Unused Equipment</u>. All dies, punches, and other equipment not specifically included in paragraph 34 shall be stored in a storm resistant

storage container or inside one of the Facility's buildings, or be completely tarped to prevent contact with storm water, when not being actively used and during all storm events.

34.   Outdoor Storage of Hammers and Large Equipment. All equipment (e.g., large hammers) that cannot be stored in a storm resistant storage container or inside one of the Facility's buildings due to its size shall be elevated and completely tarped (i.e., to prevent any contact with storm water) when not being actively used and during all storm events.

35.   Forklifts. Within ninety (90) calendar days of the Dismissal Date, all forklifts operating outside of the Facility's designated industrial areas shall be clearly marked "OUTSIDE USE" and equipped with low zinc tires, such as Roadrunner, or other tires of equivalent effectiveness and zinc concentration. Hughes shall promptly provide Plaintiff with written notice of any tire changes to the forklifts designated for use outside of the industrial areas of the Facility.

36.   Coating Galvanized Surfaces. Within thirty (30) calendar days of the Effective Date, Hughes shall paint all uncoated galvanized siding and roofs (including shed roofs) at the Facility using Behr Semi-Gloss Paint, which can be applied directly to metal and is corrosion, rust, and chemical resistant.

37.   BMP Maintenance. Beginning on the Effective Date, Hughes shall maintain all Best Management Practices ("BMPs") and related equipment (e.g., tarps and mechanical sweepers) at the Facility in good operating condition. Hughes shall repair any damaged or degraded BMPs and related equipment within seventy-two (72) hours.

38.   BMP Inspections. On a monthly basis (at approximately 30-day intervals) between October 1 and April 30 of each Reporting Year during which this AGREEMENT is in effect, Hughes shall complete an inspection of all BMPs (and related equipment). Hughes shall record its observations from these inspections on its Monthly Visual Observation Form, which shall comply with General Permit section XI.A.3. In addition to any requirements of the General Permit, Hughes shall include on

each Monthly Visual Observation Form descriptions of the status of each BMP (and related equipment), and any remedial action taken pursuant to paragraph 37.

39.   <u>Pre-Storm Event Inspections</u>. Beginning on the Effective Date, Hughes shall complete an inspection of all BMPs—including specifically the condition of any tarps covering equipment, and that the manual sweeping program is effectively removing dust and debris from areas the mechanical sweeper cannot clean—during work hours within the twenty-four (24) hours prior to any forecast rain event where there is a greater than 50% chance of 0.1 inches or more of rain (as predicted at www.wunderground.com).

40.   <u>Pre-Storm Event Inspection Logs</u>. Hughes shall create a pre-storm event inspection form on which staff shall record the date and time of any inspection, as well as the status each BMP currently being implemented at the Facility.

41.   <u>Nitrate Rinse Tank</u>.  On or before the Dismissal Date, Hughes shall move the nitrate rinse tank, which is currently located outside, into one of the Facility's buildings.

## C.   Limitations on Use Areas Designated as Non-Industrial

42.   Any industrial activity conducted in areas of the Facility designated as non-industrial in the then-effective SWPPP shall be a violation of this AGREEMENT. For purposes of this AGREEMENT, industrial activity shall include, but is not limited to: (i) activities categorized under Standard Industrial Classification ("SIC") codes 3728, 3369, 3499 and 3398; (ii) activities categorized under SIC codes 4212 and 4231, including the fueling, maintenance, repair, cleaning, and/or lubricating of any vehicle; and (iii) storage of equipment associated with industrial activity at the Facility, including raw materials, as well as intermediate and finished products.

## D.   Storm Water Pollution Prevention Plan

43.   <u>SWPPP Revision</u>. Hughes shall update its Storm Water Pollution Prevention Plan ("SWPPP") to incorporate changes related to this AGREEMENT and submit it to Plaintiff within fifteen (15) calendar days of the Effective Date.

44.   The updated SWPPP shall contain the following elements:

a. a pollutant source assessment, including all elements required by Section X.G of the General Permit as well as assessments of the potential for the Facility's storm water discharges to contain pollutants for which the Receiving Waters are 303(d) listed and/or have Total Maximum Daily Loads;

b. a description and narrative assessment of each industrial activity with the potential to impact storm water quality occurring at the Facility in strict compliance with Sections X.G.1 and X.G.2 of the General Permit;

c. descriptions of all BMPs, including those required by this AGREEMENT, in accordance with Section X.H.4.a.i, ii, iii, iv, v, vi, and vii of the General Permit;

d. a set of site maps that comply with Section X.E of the General Permit; and

e. a Monitoring Implementation Plan as required by Sections XI and X.I of the General Permit, which shall incorporate all applicable monitoring requirements detailed in Section IV.E. of this AGREEMENT.

45.   SWPPP Review. Plaintiff shall have thirty (30) calendar days from receipt of the updated SWPPP described in paragraph 44 to propose any modifications or additions. Defendant shall incorporate Plaintiff's modifications or additions to the updated SWPPP within thirty (30) calendar days of notification of proposed changes, or provide a detailed written justification explaining why any comment or recommendation will be not accepted and/or incorporated.

46.   SWPPP Revisions and Updating. During the term of this AGREEMENT, Hughes shall revise and update the Facility's SWPPP and/or site maps within thirty (30) calendar days of any change(s) that may influence or affect storm water pollution control at the Facility, including but not limited to obtaining new information regarding pollutant sources, moving a discharge or sampling point, modifying the topography of the site so as to change a drainage area, or removing or adding structural BMPs. Hughes shall submit the revised Facility SWPPP and/or site maps to Plaintiff and shall upload

the revised version to the Stormwater Multiple Application and Report Tracking System ("SMARTS") database.

47.     Plaintiff may provide comments to, or seek clarification of, any revised Facility SWPPP and/or site maps. Plaintiff shall have thirty (30) calendar days from receipt of a revised SWPPP and/or site maps to propose any modifications or additions. Hughes shall incorporate Plaintiff's modifications or additions to the revised SWPPP and/or site maps within twenty-one (21) calendar days of notification of proposed changes, or provide a detailed written justification explaining why any comment or recommendation will be not accepted and/or incorporated.

48.     In the event of any dispute regarding the timing or adequacy of Hughes' updates or revisions to the Facility' SWPPP and/or site maps, either Party may invoke the Dispute Resolution procedures set out in Section V of this AGREEMENT.

### E.     Storm Water Monitoring

49.     Hughes shall collect and analyze storm water samples from at least four (4) Qualifying Storm Events ("QSEs" as defined in the Industrial General Permit) during each Reporting Year per General Permit section XI.B.2, including specifically: two (2) storm water samples QSEs between July and December, and two (2) storm water samples from QSEs between January and June. The results of each sample shall be compared to the Table 1 Standards.

50.     Sample Collection Before Treatment System Installation. Prior to the installation of the Treatment System, Hughes shall collect storm water samples during QSEs at the three (3) points identified in the site map attached as Exhibit B, as well as at Discharge Point 4.

51.     Sample Collection Following Treatment System Installation. After the installation of the Treatment System, Hughes shall collect storm water samples during QSEs from the:

        a.     Treatment System's discharge port(s); and

b.  Unless and until the Trench Drain is connected to the Treatment System, Discharge Point 4.

52.  <u>Requirement to Collect Samples at Additional Discharge Points</u>. In the event Hughes adds one or more discharge points anywhere at the Facility during the term of this AGREEMENT, Hughes shall immediately update its SWPPP and apply the sampling collection/analysis requirements contained in this AGREEMENT to such new discharge point(s).

53.  <u>Exceedance</u>. For purposes of this AGREEMENT, and consistent with the definition in Section V.C.1. of the General Permit, an exceedance ("Exceedance") occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceeds the applicable Table 1 Standard (e.g., an exceedance of the 0.06749 mg/L standard for copper on December 8, 2023 and on March 18, 2024, or two (2) exceedances of the 0.094 mg/L standard for lead at different sampling locations on December 11, 2022).

54.  During the term of this AGREEMENT, any Exceedance on or after October 1, 2023 shall be a violation of this AGREEMENT that will trigger the Dispute Resolution provisions in Section V.

55.  Following the installation of the Treatment System (per paragraphs 23 through 28), the discharge of industrial storm water from the Facility from any point other than the Treatment System port(s), or Discharge Point 4 (unless and until the Trench Drain is connected to the Treatment System), is a violation of this AGREEMENT that will trigger the Dispute Resolution provisions in Section V.

56.  Hughes shall, at a minimum, analyze all storm water samples collected at the Facility for the parameters identified in Table 1.

//

//

//

//

**TABLE 1**

| Parameter | Numeric Standard | Source |
|---|---|---|
| pH | 6.0 – 9.0 SU | NAL/EPA Benchmark |
| oil & grease | 15 mg/L | NAL/EPA Benchmark |
| total suspended solids | 100 mg/L (annual avg) 400 mg/L (max) | NAL |
| iron (total) | 1.0 mg/L | NAL |
| aluminum (total) | 0.75 mg/L | NAL/EPA Benchmark |
| copper (total) | 0.06749 mg/L | TMDL/NEL |
| lead (total) | 0.094 mg/L | TMDL/NEL |
| zinc (total) | 0.159 mg/L | TMDL/NEL |
| nitrite + nitrate nitrogen as N | 0.68 mg/L | NAL/EPA Benchmark |

57.     Hughes shall, in addition to parameters identified in Table 1, analyze all storm water samples for additional pollutants, if any, identified in a pollutant source assessment conducted as part of revising the Facility's SWPPP.

58.     Hughes shall provide LA Waterkeeper with all storm water sampling data within five (5) business days of its receipt from the laboratory during the term of this AGREEMENT. When providing LA Waterkeeper with storm water sampling data, Hughes shall also include all data collected by/from the rain gauge/sensor (described in paragraph 18) since the last storm water sample was collected and analyzed.

59.     <u>Certified Laboratory</u>.  Except for pH samples, Hughes shall deliver all storm water samples collected pursuant to this AGREEMENT to a California state certified environmental laboratory or laboratories for analysis within the time needed for analysis within laboratory method allowable hold times. The laboratory/ies shall thereafter conduct analysis sufficient to detect individual constituents at or below the concentrations set forth in <u>Table 1</u>.

60.     <u>Monthly Visual Observations</u>. Hughes shall conduct monthly visual observations per the General Permit section XI.A.1 to ensure adequate BMP implementation and

effectiveness. Hughes shall maintain logs for all monthly visual observation events per General Permit section XI.A.3.

61.   Sampling Event Observations. Hughes shall conduct sampling event visual observations per the General Permit section XI.A.2 to ensure adequate BMP implementation and effectiveness. Hughes shall maintain logs for all sampling event visual observations per General Permit section XI.A.3.

**F.   Employee Training**

62.   Training Program. Within fifteen (15) calendar days of submitting its revised SWPPP to SMARTS, Hughes shall review and revise its employee training program to ensure compliance with the requirements of this AGREEMENT and the General Permit, including any training materials, as necessary, for implementation of the training program ("Training Program"). Hughes shall submit all Training Program materials to LA Waterkeeper upon completion, and incorporate the Training Program into its SWPPP as soon as practicable.

63.   The Training Program shall provide: (a) that a sufficient number of employees are delegated to achieve compliance with this AGREEMENT and the General Permit; and (b) that these employees are properly trained to perform the required compliance activities under this AGREEMENT and the General Permit.

64.   The Training Program shall, at a minimum, include the following:

a.   Non-Storm Water Discharge Training. Hughes shall train all non-clerical employees in the General Permit's prohibition of non-storm water discharges so that employees know what non-storm water discharges are, how to detect them, how to prevent them, and procedures for reporting non-compliance;

b.   Treatment System Training. As applicable, Hughes shall train employees in the proper operation, management, and maintenance of the Treatment System installed at the Facility;

c. Employee Designation. Hughes shall designate (by position/title) employees for specific SWPPP implementation responsibilities;

d. Monitoring Training. Hughes shall train all individuals managing any Facility Treatment System and/or collecting any samples at the Facility pursuant to this AGREEMENT or the General Permit on the technical protocols, including any chain of custody requirements, to ensure storm water samples are properly collected, stored, and submitted to a certified laboratory; and

e. Visual Observation Training. Defendant shall provide training to all individuals performing visual observations at the Facility pursuant to this AGREEMENT and the General Permit.

65. <u>Language</u>. The training and training materials shall be available and offered in the language(s) in which relevant employees are fluent. If necessary, Hughes shall provide a translator or translators at all trainings where such translation is likely to improve staff comprehension of the Training Program and improve compliance with this AGREEMENT and the General Permit.

66. <u>Staff Training</u>: Staff trainings shall be provided by a Qualified Industrial Storm Water Practitioner (as defined in Section IX.A of the 2015 Permit) familiar with the requirements of this AGREEMENT and the General Permit. Hughes shall, at a minimum, complete: (a) annual trainings for all relevant staff/employees in September of each Reporting Year; and (b) trainings for all newly hired staff/employees within thirty (30) calendar days of their first day of work at the Facility.

67. <u>Training Records</u>. Hughes shall maintain training records to document compliance with paragraphs 62 through 65 and shall provide LA Waterkeeper with a copy of these records within fourteen (14) calendar days of receipt of a written request.

68. <u>Site Inspection</u>. LA Waterkeeper may conduct one (1) site inspection for the purpose of ensuring compliance with this AGREEMENT and the General Permit during the term of this AGREEMENT.

69.   <u>Dispute-Specific Site Inspection</u>. In the event the Parties dispute Hughes' compliance with this AGREEMENT pursuant to the Dispute Resolution procedures set out in Section V of this AGREEMENT, and if a site inspection would be relevant to resolving the Parties' dispute, Hughes shall permit LA Waterkeeper to conduct an additional site inspection during the term of the AGREEMENT to resolve any such dispute(s). LA Waterkeeper shall not unreasonably request, and Hughes shall not unreasonably deny additional site inspections.

70.   <u>Site Inspection Notice</u>. Any site inspection shall occur Monday through Friday between 9:00 a.m. and 4:00 p.m. LA Waterkeeper will provide Defendant with no less than forty-eight (48) hours' notice prior to any dry weather inspection, twenty-four (24) hours' notice prior to any anticipated wet weather inspection, or by Friday for a Monday inspection. Notice will be provided by telephone and electronic mail to the individual(s) designated below at paragraph 96.

71.   <u>Inspection Details</u>. LA Waterkeeper shall limit inspection participants to three individuals, all of whom agree to execute the attached Release and Waiver (Exhibit C) prior to entering the Facility. During any site inspection, LA Waterkeeper's representative(s) shall be permitted to take photographs or video recordings, as well as collect storm water samples. Plaintiff shall not disclose any information (e.g., photos, videos, sample data) obtained as a result of a Site Inspection to any third party, except that such information may be disclosed to: (a) a consultant for the limited purpose of assessing the Facility's storm water pollution control program; and/or (b) the District Court as part of enforcing compliance with this AGREEMENT.

72.   <u>Document Provision</u>. During the term of this AGREEMENT, Defendant shall:

    a.   copy Plaintiff on all documents and written communications submitted to the Los Angeles Regional Water Quality Control Board, Region 4, the State Water Resources Control Board, and/or any Federal, State, local agency, county, or municipality that are related to compliance with the General Permit and/or this AGREEMENT; and

b.  provide Plaintiff with all documents and written communications directly related to compliance with the General Permit and/or this AGREEMENT that are received by Defendant from any Federal, State, local agency, county, or municipality within fourteen (14) calendar days of receipt by Defendant.

73.  <u>Compliance Monitoring</u>. Defendant shall partially defray costs associated with Plaintiff's monitoring compliance with this AGREEMENT by making payments totaling thirteen thousand dollars ($13,000.00). Hughes shall make an initial payment of three thousand dollars ($3,000.00) within ten (10) days of the Dismissal Date, and a second payment of ten thousand dollars ($10,000.00) on or before October 1, 2023. Payments shall be mailed to: Los Angeles Waterkeeper, 360 E. 2nd St. Suite 250, Los Angeles, CA 90012.

**H.   Environmental Mitigation and Litigation Fees and Costs**

74.  <u>Environmental Mitigation Project</u>. Defendant shall make one environmental mitigation payment to the Rose Foundation for Communities and the Environment ("Rose Foundation"), an environmental non-profit organization. The payment of forty thousand dollars ($40,000.00) shall be made on or before June 1, 2023. Payment shall be mailed via certified mail or overnight delivery to: Rose Foundation, ATTN: LA Waterkeeper v. Hughes Brothers Aircrafters Receiver, 201 4th Street, Ste. 102, Oakland, California 94607. Environmental mitigation payment funds will be used to support environmental projects related to water quality in the Southern California Bight, and designed to analyze, reduce, prevent, and/or otherwise mitigate the ecological or public health effects of industrial storm water and/or non-stormwater discharges.

75.  <u>Fees and Costs</u>. Defendant agrees to pay a total of eighty thousand dollars ($80,000.00) to reimburse LA Waterkeeper for costs, including expert/consultant fees and costs, and partially reimburse LA Waterkeeper for reasonable attorneys' fees incurred as a result of investigating and filing the lawsuit, negotiating a resolution of this matter, notifying the Federal Agencies, and drafting/filing all necessary documents

with the Court. The first payment of forty thousand dollars ($40,000.00) shall be sent by certified mail or overnight delivery within ten (10) calendar days of the Dismissal Date to: Sycamore Law Attorney Client Trust Account, 1004 O'Reilly Ave, San Francisco, California, 94129. The second payment of forty thousand dollars ($40,000.00) shall be sent by certified mail or overnight delivery on or before January 15, 2023 to: Sycamore Law Attorney Client Trust Account, 1004 O'Reilly Ave, San Francisco, California, 94129.

## V.   DISPUTE RESOLUTION

76.   This Court shall retain jurisdiction over this matter for the term of this AGREEMENT for the purposes of enforcing its terms and conditions, and adjudicating any and all disputes among the SETTLING PARTIES that may arise relating to any provision of this AGREEMENT. The Court shall have the power to enforce this AGREEMENT with all available legal and equitable remedies.

77.   Meet and Confer. Either Party to this AGREEMENT may invoke the dispute resolution procedures of this Section V by notifying the other party in writing of the matter(s) in dispute and of the disputing party's proposal for resolution. The Parties shall then meet and confer in good faith (either telephonically or in person) within fourteen (14) calendar days of the date of the notice in an attempt to fully resolve the dispute.

78.   Motion. In the event that the Parties cannot fully resolve the dispute within thirty (30) calendar days of the meet and confer described in paragraph 77, the Parties agree that the dispute may be submitted for formal resolution by filing a motion before the United States District Court for the Central District of California. The Parties agree to request an expedited hearing schedule on the motion.

79.   Prevailing Party Fees. In resolving any dispute arising from this AGREEMENT before the Court, the prevailing Party shall be entitled to fees and costs incurred pursuant to the provisions set forth in section 505(d) of the Clean Water Act, 33

U.S.C.§ 1365(d), applicable case law interpreting such provisions, or as otherwise provided for by statute and/or case law.

## VI.   RELEASE OF LIABILITY AND COVENANT NOT TO SUE

80.   Waiver and Releases. In consideration of the above, upon the Effective Date, Plaintiff, on its own behalf and on behalf of its officers and directors, release Defendant, its officers, directors, managers, employees, members, parents, subsidiaries, divisions, affiliates, insurers, landlords, lenders, successors or assigns, agents, attorneys and other representatives, from and waives all claims and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions, or causes of action, either at law or in equity, known or unknown, which it may presently have, or which may later accrue or be acquired by it and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions, or causes of action, either at law or in equity, known or unknown, which it may presently have, or which may later accrue or be acquired by it, that were or could have been raised based on the 60-Day Notice Letter and/or Complaint up to and including the Termination Date of this AGREEMENT, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed.

81.   In addition, upon the Dismissal Date, the SETTLING PARTIES expressly waive any rights or benefits available to them under the provisions of California Civil Code § 1542. The SETTLING PARTIES acknowledge they are familiar with section 1542 of the California Civil Code, with provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." While a Party may assert that California Civil Code section 1542 applies to general releases only, and that the releases herein are limited releases,

the Parties hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims arising from, or related to, the allegations and claims as set forth in the 60-Day Notice, and/or the Complaint, up to and including the Termination Date of this AGREEMENT.

82.   Except as provided for in Section V of this AGREEMENT, LA Waterkeeper and its officers, executive staff, attorneys, members of its governing board and any organization under the control of LA Waterkeeper, its officers, executive staff, attorneys, or members of its governing board, shall not pursue or file any action against HUGHES seeking relief for any alleged violation of the Clean Water Act that were or could have been noticed and/or alleged in the 60-Day Notice Letter or Complaint for the period of time beginning on the Effective Date and ending on the Termination Date.

83.   Nothing in this AGREEMENT limits or otherwise affects the SETTLING PARTIES' rights to address or take any position that either deems necessary or appropriate in any informal or formal proceeding before the State Water Board, Regional Water Board, California Environmental Protection Agency, U.S. EPA, or any other judicial or administrative body on any matter relating to Defendant's compliance at the Facility with the General Permit or the Clean Water Act.

## VII.   MISCELLANEOUS PROVISIONS

84.   No Admission of Liability. The Parties enter into this AGREEMENT for the purpose of avoiding prolonged and costly litigation on disputed claims. Neither the AGREEMENT nor any payment pursuant to the AGREEMENT shall constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Hughes maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

85.   Counterparts.  This AGREEMENT may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopy,

electronic mail, and/or facsimile copies of an original signature shall be deemed to be originally executed counterparts of this AGREEMENT.

86.   <u>Authority</u>.  The undersigned representatives for Plaintiff and Defendant each certify that they are fully authorized by the Party whom they represent to enter into this AGREEMENT. A Party's signature to this AGREEMENT transmitted by facsimile or electronic mail shall be deemed binding.

87.   <u>Construction</u>.  The language in all parts of this AGREEMENT shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Permit, the Clean Water Act, or specifically herein. The captions and paragraph headings used in this AGREEMENT are for reference only and shall not affect the construction of this AGREEMENT.

88.   <u>Full Settlement</u>.  This AGREEMENT constitutes a full and final settlement of this matter.

89.   <u>Integration Clause</u>.  This is an integrated AGREEMENT. This AGREEMENT is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this AGREEMENT.

90.   <u>Severability</u>.  In the event that any provision, paragraph, section, or sentence of this AGREEMENT is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

91.   <u>Choice of Law</u>.  The laws of the United States shall govern this AGREEMENT.

92.   <u>Negotiated Settlement</u>. The Settling Parties have negotiated this AGREEMENT, and agree that it shall not be construed against the Party preparing it, but shall be construed as if the Settling Parties jointly prepared this AGREEMENT. Any uncertainty and ambiguity shall not be interpreted against any one Party.

93.   <u>Modification of the AGREEMENT</u>.  This AGREEMENT, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written

instrument, signed by the Parties. In the event that there is a dispute regarding a change, waiver, discharge, or termination of any provision(s), either Party may seek resolution from the court.

94.  Assignment. Subject only to the express restrictions contained in this AGREEMENT, all of the rights, duties, and obligations contained in this AGREEMENT shall inure to the benefit of and be binding upon the SETTLING PARTIES, and their successors and assigns. Defendant shall notify Plaintiff within ten (10) calendar days of any assignment.

95.  Force Majeure.  Either Parties' performance of any requirement of this AGREEMENT shall be extended or modified in the case of a force majeure event as follows:

   a.  A "force majeure event" is any event arising from causes beyond either Party's control that prevents or delays the performance of any requirement of this AGREEMENT despite its best efforts to fulfill the requirement;

   b.  The requirement to exercise "best efforts to fulfill the requirement" includes using good faith efforts to anticipate any potential force majeure event and good faith efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred, to prevent or minimize any delay to the greatest extent possible;

   c.  A Force Majeure event includes without limitation, any act of God, war, fire, earthquake, flood, hurricane, windstorm, or natural catastrophe; explosions, vehicle collisions or crashes, criminal acts, civil disturbance, vandalism, accident, sabotage, or terrorism; governmental order or decree; restraint by court order or public authority or agency; or action or non-action by, or inability to obtain the necessary authorizations or approvals from, any governmental entity.  A force majeure event includes government orders or restrictions related to COVID-19 and comparable public health threats. Any Party seeking to rely upon this paragraph to excuse or postpone

performance shall have the burden of establishing that it could not reasonably have been expected to avoid the force majeure event, and which by exercise of due diligence has been unable to overcome the failure to perform;

    d.    A force majeure event does not include normal inclement weather, a financial inability to pay, or employee negligence;

    e.    If Hughes seeks to avoid performance of any requirement of this AGREEMENT on account of a force majeure event, it shall provide written notice to Plaintiff no later than ten (10) calendar days after the time that Hughes first knew of, or by the exercise of due diligence, should have known of, a force majeure event. The notice shall state the anticipated duration of any delay, its cause(s), and propose an alternative schedule for performing the affected requirement(s);

    f.    If Plaintiff agrees that a force majeure event has occurred, Plaintiff shall agree to extend the time for Hughes to perform the affected requirement(s) for the time necessary to complete those obligations; and

    g.    If Plaintiff does not agree that a force majeure event has occurred or does not agree to the extension of time sought by Hughes, Plaintiff may invoke the Dispute Resolution Procedures in Section V of this AGREEMENT.

96.   <u>Correspondence</u>.  All notices required herein or any other correspondence pertaining to this AGREEMENT shall be, the extent feasible, sent via electronic mail transmission to the e-mail address listed below, or if electronic mail is not feasible, then by certified U.S. mail with return receipt, overnight delivery, or by hand delivery to the following addresses:

//

//

//

//

| | |
|---|---|
| If to Plaintiff: | If to Defendant: |
| Jesse C. Swanhuyser<br>Sycamore Law, Inc.<br>414 Olive Street<br>Santa Barbara, CA 93101<br>jesse@sycamore.law<br>Tel: (805) 689-1469 | Jim Hughes<br>Hughes Brothers Aircrafters, Inc.<br>11010 Garfield Place<br>South Gate, CA 90280<br>JHughes@hbai.com<br>Tel: (323) 773-4541 |
| With copies to: | With copies to: |
| Benjamin Harris<br>Los Angeles Waterkeeper<br>360 E. 2nd St. Suite 250<br>Los Angeles, CA 90012<br>ben@lawaterkeeper.org<br>Tel: 310-394-6162, ext. 102 | Melissa Thorme<br>Downey Brand LLP<br>621 Capitol Mall, Fl 18,<br>Sacramento, CA 95814-4731<br>mthorme@downeybrand.com<br>Tel: (916) 520-5376 |
| Barak Kamelgard<br>Los Angeles Waterkeeper<br>360 E 2nd Street Suite 250<br>Los Angeles, CA 90012<br>barak@lawaterkeeper.org<br>Tel: (310) 394-6162 | G. Steven Cuevas<br>Attorney at Law<br>1002 North Ross Street<br>Santa Ana, California 92701<br>cuevaslaw@aol.com<br>Tel: (714) 667-0880 |

Notifications of communications shall be deemed received upon emailing unless a send failure notice is received; three (3) calendar days after the date postmarked and sent by first-class mail; upon proof of delivery for overnight delivery; upon receipt when personally delivered: or upon delivery after acknowledgement of receipt by the receiving party. Any change of address or addresses shall be communicated in the manner described above for giving notices.

97.    If for any reason the U.S. Department of Justice ("DOJ") or the District Court should decline to approve this AGREEMENT in the form presented, the Parties shall use their best efforts to work together to modify the AGREEMENT within thirty (30) calendar days so that it is acceptable to the DOJ or the District Court. If the Parties are unable to modify this AGREEMENT in a mutually acceptable manner acceptable to the DOJ or the District Court, this AGREEMENT shall immediately be null and void as well as inadmissible and considered a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

IN WITNESS WHEREOF, the undersigned have executed this AGREEMENT as of the date set forth below.

**APPROVED AS TO CONTENT**

LOS ANGELES WATERKEEPER

by: _____
    Bruce Reznik
    Executive Director

Date:  October 6, 2022

HUGHES BROTHERS AIRCRAFTERS, INC.

by: _____
    Jim Hughes
    Owner

Date:  _____, 2022

**APPROVED AS TO FORM**

SYCAMORE LAW, INC.

by: _____
    Jesse C. Swanhuyser
    Attorneys for Plaintiff

Date:  October 6, 2022

DOWNEY BRAND LLP

by: _____
    Melissa A. Thorme
    Attorneys for Defendant

Date:  _____, 2022

1    IN WITNESS WHEREOF, the undersigned have executed this AGREEMENT as of the
     date set forth below.

2

3    **APPROVED AS TO CONTENT**

4    LOS ANGELES WATERKEEPER          HUGHES BROTHERS
                                      AIRCRAFTERS, INC.
5

6    by:  _____         by: _____
          Bruce Reznik                    Jim Hughes
7         Executive Director              Owner

8    Date: _____, 2022           Date: Oct 5, 2022

9

10

11

12   **APPROVED AS TO FORM**

13

14   SYCAMORE LAW, INC.               DOWNEY BRAND LLP

15   by:  _____
16        Jesse C. Swanhuyser         by: _____
17        Attorneys for Plaintiff

18   Date: _____, 2022               Melissa A. Thorme
                                          Attorneys for Defendant
19
                                      Date:  October 4, 2022
20

21

22

23

24

25

26

27

28

STIPULATED SETTLEMENT AGREEMENT          28          Case No. 2:22-cv-04458-DSF-JPR

# EXHIBIT A

### Approximate Location of Trench Drain in Blue Area
(referred to in paragraphs 20 through 22 of the Stipulated Settlement Agreement
between Los Angeles Waterkeeper and Hughes Brothers Aircrafters, Inc.)



# # #



EXHIBIT B

**EXHIBIT C**

ASSUMPTION OF RISK/INCURRED RISK AGREEMENT
AND RELEASE
**READ CAREFULLY BEFORE SIGNING**

In consideration of admittance to Hughes Brothers Aircrafters, Inc. ("the Company") facility located at 11010 Garfield Place, South Gate, California 90280 ("the Premises") on _____, 202___ for purposes of a site visit associated with confidential settlement discussions in connection with *Los Angeles Waterkeeper v. Hughes Brothers Aircrafters, Inc.*, U.S. District Court, Central District of California, Case No. 2:22−cv−04458−DSF−JPR, the undersigned, in their individual and/or guardian capacity, fully and unconditionally assumes and incurs (except to the extent arising from the gross negligence or willful misconduct of the Company or its parents, affiliates, subsidiaries or its or their respective employees) all responsibility for all risk of damage or injury, including death, that may occur to the undersigned's person or property while present on the Company Premises**.**  In so doing, the undersigned hereby releases and discharges the Company, its successors, assigns, affiliates, shareholder(s), officers, directors, employees, agents and legal representatives from all claims, losses, demands, liability, actions or causes of action, present or future, whether known or unknown, anticipated or unanticipated, of any kind or character (including, without limitation, for attorneys' fees, costs and expenses), resulting from or arising out of the undersigned's presence on the Premises.  For the avoidance of doubt, the undersigned shall indemnify the Company (or its parents, subsidiaries or its or their respective employees, etc.) for any claim that may be available to any person in connection with, resulting from, or arising out of the undersigned's presence on the Premises,  except to the extent that such claim(s) alleges gross negligence and/or willful misconduct of the Company.

The undersigned hereby waives any and all right to bring any legal action against the Company, its parents or subsidiaries and its and their respective employees for injury or damage that may be sustained while present on the Premises, except to the extent caused by the gross negligence or willful misconduct of the Company.

This Agreement shall be binding on the undersigned as well as the undersigned's heirs, successors, assigns, executors and personal representatives, and shall be an absolute bar to any future claims the undersigned may have against the Company its parents or subsidiaries and its and their respective employees relating to the undersigned's presence on the Company's Premises except as expressly provided herein.

In Witness Whereof, the undersigned has read and caused this Agreement to be executed freely and knowledgeably this the _____th day of ____, 202__, after ample opportunity to review the document with any individuals, advisors and counsel if so desired.

_____
Signature

                                               _____
                                               Witness

_____
Print Name

_____
Street Address

_____
City, State and Zip Code

1831690v1